*65*

CLOSED _____

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

# F I L E D

**SEP 2 9 2004**

**CLERK'S OFFICE**
**U.S. DISTRICT COURT**
**EASTERN MICHIGAN**

AUTOMOTIVE TECHNOLOGIES
INTERNATIONAL, INC., a Delaware
corporation,

        Plaintiff,

CASE NO. 03-71368
HON. LAWRENCE P. ZATKOFF

v.

DELPHI CORPORATION, a Delaware
corporation,

        Defendant.

_____/



## OPINION AND ORDER

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Detroit, State of Michigan, on

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## I. INTRODUCTION

This matter is before the Court on the following motions: (1) Plaintiff's Motion for Summary

Judgment of Infringement; (2) Defendant's Motion for Partial Summary Judgment of

Noninfringement of Claims 2 and 6-11 of U.S. Patent No. 6,442,504; (3) Defendant's Motion for

Summary Judgment of Invalidity of Claims 1-11 of U.S. Patent No. 6,442,504 Under 35 U.S.C. §

102, and (4) Defendant's Motion for Partial Summary Judgment of Invalidity of Claims 8-11 of U.S.

Patent No. 6,442,504 Under 35 U.S.C. § 112, ¶ 1. These motions are fully briefed. The Court finds

that the facts and legal arguments are adequately presented in the parties' papers and the decisional

process would not be significantly aided by oral argument. Therefore, pursuant to E.D. MICH. L.R.

7.1(e)(2), it is hereby ORDERED that the motions be resolved on the briefs submitted. For the

reasons set forth below, all of the above motions will be GRANTED IN PART.

## II.  BACKGROUND

This is a patent infringement action in which Plaintiff Automotive Technologies

International, Inc., asserts that Defendant Delphi Corporation's Passive Occupant Detection System,

also known as "PODS-B," infringes U.S. Patent No. 6,442,504, (hereinafter "the '504 patent"). The

'504 patent is held by Plaintiff and entitled "Apparatus And Method For Measuring Weight Of An

Object In A Seat." Defendant maintains that its PODS-B system does not infringe any of the claims

contained in the '504 patent and, furthermore, that the asserted claims of the '504 patent are invalid.

A.    **Facts**

1.    **The '504 patent**

The '504 patent is assigned to Plaintiff and was issued on August 27, 2002, to David S.

Breed, Wilbur E. DuVall, and Jeffrey L. Morin. The '504 patent teaches the use of sensors within

the cabin of a motor vehicle to determine certain morphological characteristics of motor vehicle

occupants.[1]    The specification of the '504 patent suggests that once these morphological

---

[1] The '504 patent specification states that "Morphological characteristics include the
weight of the occupant, the height of the occupant measured from the seat, the length of the
occupant's arms, the length of the occupant's legs, the occupant's head diameter and the

2

characteristics are determined, electronic controls may be utilized to passively adjust a number of vehicle components, including a vehicle's seats, headrests, rear-view mirrors, and driver controls, among other things. The patent also discloses methods and devices for determining whether deployment of the vehicle's airbag would be dangerous if, for example, the seat occupant is a child or the occupant is positioned too close to the airbag deployment surface.[2] The patent describes how determining an occupant's weight distribution, center of gravity, and position within the vehicle is important for determining whether or not airbag deployment would be dangerous in a given situation.

Although describing various types of sensors, the '504 patent is specifically directed towards a weight sensor. The weight sensor disclosed in the '504 patent is comprised of a deformable bladder embedded in a seat that is filled with fluid and connected to a transducer. The transducer is a device that measures the pressure placed on the seat by the occupant, converts that measurement to an electrical signal, and inputs this information into a microcomputer. *See* '504 patent, col. 8, lines 37-42. In one embodiment, the invention also uses a neural network in conjunction with a microprocessor to receive and process the data from the pressure transducer. *See id.* at col. 8, lines 42-47; col. 10, lines 36-40; col. 18, line 60 to col. 19, line 54. As a result of the data processing, it is possible to prevent deployment of a vehicle's airbag in situations where deployment may be

_____

inclination of the occupant's back relative to the seat bottom." '504 patent, at col. 1, lines 49-54.

[2] "[I]t is a principal object of the present invention to provide new and improved vehicular component adjustment apparatus and methods which evaluate the occupancy of the seat based at least in part on a measurement of the weight applied onto the seat . . . [and] to provide a new and improved adjustment apparatus and methods that reliably discriminate between a normally seated passenger and a forward facing child seat, between an abnormally seated passenger and a rear facing child seat, and whether or not the seat is empty . . . ." '504 patent col. 6, lines 12 - 45.

3

unnecessary or dangerous to an occupant. *See* '504 patent, at col. 1, line 62 to col. 2, lines 1-13; col. 6, lines 36-44.

Figure 1 of the '504 patent shows one version of the weight sensor consisting of a bladder 5 having only one chamber:



Figure 12 shows another version of the bladder consisting of an outer container **515** and an inner chamber **518** and is described as part of a weight sensor used to passively adjust the stiffness of a seat:



4

Figure 12A of the '504 patent shows another version of the bladder **515** having multiple chambers **518a-518d** and is described as part of a weight sensor used to determine an occupant's weight distribution, position within the vehicle, and center of gravity:



FIG. 12A

According to the specification of the '504 patent, the use of multiple chambers contained within the bladder is what allows the invention to determine an occupant's position, weight distribution, and center of gravity in order to allow deployment of the vehicle's airbag in a safe manner:

> Naturally, bladder **515** can be composed of multiple chambers **515a**, **515b**, **515c**, and **515d** as shown in FIG. 12A. The use of multiple chambers permits the weight distribution of the occupant to be determined if a separate pressure transducer is used in each cell of the bladder. Such a scheme gives the opportunity of determining to some extent the position of the occupant on the seat or at least the position of the center of gravity of the occupant. Naturally, more than four cells could be used.

'504 patent, at col. 29, lines 20-30; *see also* '504 patent, at col. 13, lines 42-47 ("A single chamber is sufficient if the overall weight of the occupant is desired. If the weight distribution of the occupant is required, then multiple chambers become necessary.").

5

The '504 patent discloses that determining the weight distribution, position, and center of gravity is important to ensure that an airbag will not deploy in situations where an occupant is "out-of-position." "Out-of position," according to the '504 patent, means "that the occupant, either the driver or a passenger, is sufficiently close to the occupant . . . protection apparatus (airbag) prior to deployment that he or she is likely to be more seriously injured by the deployment event itself than by the accident." *Id.* at col. 5, lines 33-38. In addition, "out-of-position" "may also mean that the occupant is not positioned appropriately in order to attain the beneficial restraining effects of the deployment of the airbag." *Id.* at col. 5, lines 38-40. Thus, the '504 patent teaches the use of multiple fluid-filled chambers in conjunction with multiple transducers and a processor means to determine the weight, weight distribution, position, and center of gravity of an occupant in order to prevent deployment of a vehicle's airbag in unsafe situations.

## 2.    Defendant's PODS-B Product

Like the invention described in the '504 patent, Defendant's PODS-B product is a fluid-filled bladder system used in vehicles to determine whether or not to deploy a vehicle's airbag. Defendant appears to have achieved commercial success with the product, selling it to numerous vehicle manufacturers. It is undisputed that the PODS-B product includes at least (1) a bladder, (2) a transducer, and (3) an electronic control unit, (hereinafter "ECU"). The Court will briefly discuss each feature.

### a.    The PODS-B Bladder

Unlike the bladder system depicted in Figure 12A of the '504 patent, the PODS-B product does not contain multiple completely enclosed chambers. Rather, the PODS-B bladder has no enclosed chambers, and fluid is allowed to flow freely throughout the entire bladder. According to

6

Defendant, the PODS-B bladder uses various "spot welds," which are areas where the upper portion of the bladder is fused to the lower portion of the bladder, in order to achieve bladder stability and reduce the amount of fluid required to get an accurate pressure reading. Plaintiff maintains that between these spot welds are raised areas that constitute multiple chambers, similar to the multiple chambers described in the '504 patent. In the past, Defendant's engineers have referred to these raised areas between the spot welds as "cells." Defendant, however, argues that PODS-B cells are not the same as the '504 patent's multiple chambers, because fluid is not allowed to flow freely between the chambers disclosed in the '504 patent. Furthermore, according to Defendant, the term "chamber" means a completely enclosed space unlike the space within the PODS-B cells, which is not enclosed. According to Defendant, the following figures from U.S. Patent No. 6,101,436 accurately depict the PODS-B bladder, with Figure 1 showing the bladder as it is positioned in a vehicle seat, and Figure 2 showing a cut-away view of the bladder and seat:



7

### b.    The PODS-B Pressure Transducer and ECU

Attached to the PODS-B bladder is a pressure transducer that converts the pressure exerted on the bladder into an electronic signal. That signal then travels to an ECU. According to Charles Gray, Defendant's Technical Manager for its occupant detection systems, the ECU compares the pressure transducer voltage signal and outputs of other sensors, such as a seat belt sensor and accelerometer, to a threshold value set by Defendant's customers. Based upon the comparison of the measured pressure with the threshold value, in addition to consideration of the outputs of the seat belt sensor and accelerometer, the PODS-B ECU generates an electrical signal output indicative of one of four conditions: (i) an adult is sitting in the seat; (ii) a child is sitting in the seat; (iii) a child's car seat is belted into the seat; or (iv) unable to determine who/what is in the seat. *See* Gray Decl. at ¶ 12. The seat belt tension sensor's only purpose is to measure the tension in the seat belt, which is then used by the ECU to determine whether the object in the seat is a child's car seat. *See id.* According to Mr. Gray, the ECU is incapable of receiving pressure signals from more than one pressure sensor.

In a general sense, the PODS-B product is similar to the invention described in the '504 patent. Like the patented invention, the PODS-B product uses pressure exerted upon a fluid filled bladder to determine whether or not a vehicle's airbag should be deployed in an accident. Thus, with respect to many of the claims asserted by Plaintiff, the presence of infringement and/or invalidity will depend largely upon the Court's claim construction.

### 3.    The Asserted Claims

Plaintiff maintains that the PODS-B product infringes upon claims 1 - 2 and 4 - 11. *See* Plaintiff's Supplemental Answers to Defendant's Interrogatories 13 and 14, attached to Defendant's

8

Ex. 15. Those claims arc as follows:

What is claimed is:

1. A weight sensor for determining the weight of an occupant of a seat, comprising

> a bladder having at least one chamber adapted to be arranged in a seat portion of the seat, and

> at least one transducer for measuring the pressure in a respective one of said at least one chamber.

2. The weight sensor of claim 1, wherein said bladder comprises a plurality of chambers, each of said chambers being adapted to be arranged at a different location in the seat portion of the seat.

\*       \*       \*

4. The weight sensor of claim 1, wherein said bladder consists of a single chamber.

5. A method for determining the weight of an occupant of a seat, comprising the steps of:

> arranging a bladder having at least one chamber in a seat portion of the seat, and

> measuring the pressure in each of the at least one chamber whereby the weight of the occupant is obtainable from the measured pressure in each of the at least one chamber.

6. The method of claim 5, wherein said bladder comprises a plurality of chambers, further comprising the step of:

> arranging each of the chambers at a different location in the seat portion of the seat.

7. A method for determining the weight distribution of the occupant in a seat, comprising the steps of:

> arranging a bladder having a plurality of chambers in a seat

9

portion of the seat,

measuring the pressure in each of the chambers, and determining the weight distribution of the occupant from the measured pressure in each of the chambers.

**8.** The method of claim 7, further comprising the step of:

determining the position of the occupant based on the weight distribution.

**9.** The method of claim 7, further comprising the step of:

determining the center of gravity of the occupant based on the weight distribution.

**10.** An occupant position sensor for a vehicle for determining the position of the occupant, comprising

a weight sensor for determining the weight of an occupant of a seat, said weight sensor comprising a bladder having at least one chamber adapted to be arranged in a seat portion of the seat, and

at least one transducer for measuring the pressure in a respective one of said at least one chamber; and

processor means for receiving the determined weight of the occupant from said weight sensor and determining the position of the occupant based at least on [sic] part on the determined weight of the occupant.

**11.** The occupant position sensor of claim **10**, wherein said bladder comprises a plurality of chambers, each of said chambers being adapted to be arranged at a different location in the seat portion of the seat.

\*          \*          \*

'504 patent, at col. 32, line 1 - col. 33, line 2.

Defendant maintains that the PODS-B product does not infringe claims 2, 6 - 9 and 11

10

because the PODS-B product does not use a "plurality of chambers" required by those claims, nor does it determine "weight distribution," "position of the occupant," or "center of gravity" required by claims 7 - 11. Furthermore, according to Defendant, the PODS-B product does not have a "processor means for receiving the determined weight of the occupant . . . and determining the position of the occupant" required by claims 10 and 11. Defendant also asserts that claims 1-11 are invalid as anticipated by prior art under 35 U.S.C. § 102. Finally, Defendant asserts that claims 8-11 are invalid under the first paragraph of 35 U.S.C. § 112, because the '504 patent does not enable one skilled in the art to practice the invention recited in claims 8-11 without undue experimentation.

Plaintiff responds by arguing that despite Defendant's assertion to the contrary, numerous documents establish that the PODS-B product determines weight, weight distribution, position of the occupant, and the occupant's center of gravity. Specifically, according to Plaintiff, Defendant conducted extensive "out-of-position" testing that resulted in refinements to the PODS-B system allowing the system to determine weight, weight distribution, position, and center of gravity. In addition, Plaintiff argues that the PODS-B bladder's "cells" constitute multiple chambers. Thus, according to Plaintiff, the PODS-B product literally infringes each and every claim limitation contained in the asserted claims. Plaintiff also maintains that the '504 patent is not invalidated by prior art, nor does it fail to adequately describe how to practice the inventions disclosed in claims 8-11.

## III. LEGAL STANDARD

Summary judgment is appropriate only if the answers to interrogatories, depositions, admissions, and pleadings combined with the affidavits in support show that no genuine issue as to

11

any material fact remains and the moving party is entitled to a judgment as a matter of law. *See* FED. R. CIV. P. 56(c). A genuine issue of material fact exists when there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986) (citations omitted). In application of this summary judgment standard, the Court must view all materials supplied, including all pleadings, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-50 (citations omitted).

The moving party bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial. *See* FED. R. CIV. P. 56(c); *Celotex,* 477 U.S. at 324. The non-moving party must do more than show that there is some abstract doubt as to the material facts. It must present significant probative evidence in support of its opposition to the motion for summary judgment in order to defeat the motion for summary judgment. *See Moore v. Philip Morris Co.,* 8 F.3d 335, 339-40 (6th Cir. 1993).

## IV. ANALYSIS

Infringement and validity are both at issue in this case. "It is well settled that an infringement analysis involves two steps: the claim scope is first determined, and then the properly construed claim is compared with the accused device to determine whether all of the claim limitations are

12

present either literally or by a substantial equivalent." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001) (citing *Young Dental Mfg. Co. v. Q3 Special Prods., Inc.*, 112 F.3d 1137, 1141 (Fed. Cir. 1997)). Likewise, the first step of an invalidity analysis based on anticipation and/or obviousness in light of the prior art is no different from that of an infringement analysis. *See Amazon.com, Inc.*, 239 F.3d at 1351 (citing *Lemelson v. Gen. Mills, Inc.*, 968 F.2d 1202, 1206 (Fed. Cir. 1991)). "A claim must be construed before determining its validity just as it is first construed before deciding infringement." *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 996 (Fed. Cir. 1995)). Accordingly, the Court will address claim construction first; thereafter, the Court will address infringement and validity.

## A.    Claim Construction

Claim construction is a matter of law for the Court to decide. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). "[T]he focus in construing disputed terms in claim language is not the subjective intent of the parties to the patent contract when they used a particular term. Rather the focus is on the objective test of what one of ordinary skill in the art at the time of the invention would have understood the term to mean." *Markman*, 52 F.3d at 986. In interpreting an asserted claim, the Court should look first to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification, and, if in evidence, the prosecution history. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) (citing *Markman*, 52 F.3d at 979). "Such intrinsic evidence is the most significant source of legally operative meaning of disputed claim language." *Vitronics Corp.*, 90 F.3d at 1582.

The Federal Circuit has set forth the following steps to be followed in reviewing intrinsic evidence:

First, we look to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention. Although words in a claim are generally given their ordinary and customary meaning, a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history.

Thus, second, it is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning. The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication. As we have repeatedly stated, '[c]laims must be read in view of the specification, of which they are a part.' The specification contains a written description of the invention which must be clear and complete enough to enable those of ordinary skill in the art to make and use it. Thus, the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.

Third, the court may also consider the prosecution history of the patent, if in evidence. This history contains the complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims. As such, the record before the Patent and Trademark Office is often of critical significance in determining the meaning of the claims. Included within an analysis of the file history may be an examination of the prior art cited therein.

*Id.* at 1582-83 (citations omitted).

"In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. In such circumstances, it is improper to rely on extrinsic evidence." *Id.* at 1583. Moreover, "extrinsic evidence in general . . . may only be used only to help the court come to the proper understanding of the claims; it may not be used to vary or contradict the claim language." *Id.* at 1584. "Indeed, where the patent documents are unambiguous, expert testimony regarding the meaning of a claim is entitled to no weight." *Id.* (citation omitted). With these

14

considerations in mind, the Court will turn to the disputed claim language in this case.

## 1.    "Plurality of Chambers"

Claims 2, 6, 7-9, and 11 explicitly require a "plurality of chambers." Plaintiff argues that "plurality of chambers" means "a plurality of partially or totally enclosed spaces or compartments." Plaintiff's Claim Construction Brief, at 9. Defendant argues that "plurality of chambers" means either "a plurality of completely enclosed spaces or compartments" or, alternatively, "a plurality of completely enclosable spaces or compartments." Defendant's Claim Construction Brief, at 8. The primary difference between the two competing definitions is that unlike Plaintiff's definition, Defendant's definition does not encompass a space that is not capable of being completely enclosed. Both parties agree that the intrinsic evidence of record is sufficient to discern the meaning of the word "chamber."

The claim construction analysis begins with ascertaining the ordinary meaning of the disputed claim term. *See Johnson Worldwide Associates, Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999) ("The general rule is, of course, that terms in the claim[s] are to be given their ordinary and accustomed meaning."); *see also Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1204 (Fed. Cir. 2002) ("Consulting the written description and prosecution history as a threshold step in the claim construction process, before any effort is made to discern the ordinary and customary meanings attributed to the words themselves, invites a violation of our precedent counseling against importing limitations into the claims."). Dictionaries provide useful guidance in determining the ordinary meaning of a word. *See Texas Digital Systems, Inc.*, 308 F.3d at 1203. Plaintiff cites no dictionary definitions and relies solely on the written specification to justify its proposed construction. Defendant, on the other hand, provides numerous dictionary definitions of

15

"chamber," which indicate that the word "chamber" means either a completely enclosed space or a space, such as a judge's chamber or heart chamber, that is capable of being completely enclosed.

The Court, however, is not convinced that the word "chamber" refers only to spaces that are either completely enclosed or capable of being completely enclosed. A chamber may often be a completely enclosed space or a space capable of being enclosed, as in the case of a judge's chamber or a heart chamber. The dictionary definitions provided by Defendant, however, also encompass what Plaintiff calls "partially enclosed" spaces, or spaces which are not necessarily capable of being completely enclosed. For instance, the definition provided by Defendant defines "chamber" as "a compartment or enclosed space; cavity; a chamber of the heart." THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE (1967) (emphasis added), attached as Ex. 4 to Defendant's *Markman* brief. The word "cavity" does not necessarily imply a completely enclosed space and simply means "a three-dimensional discontinuity in the substance of a mass or body" or "a space hollowed out (as by decay)." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, 357 (1981). Moreover, the word "compartment" does not necessarily mean a completely enclosed space. *See id.* at 462 (defining "compartment" as "a subdivision of three-dimensional space: as a small chamber, receptacle, or container."). Finally, The Oxford English Dictionary includes as a definition of "chamber," "a concave part leaving a hollow space underneath." THE OXFORD ENGLISH DICTIONARY, VOL. III, 2 (2d 1989), attached as Ex. 5 to Defendant's *Markman* brief. Therefore, the Court finds that the ordinary meaning of the word "chamber" encompasses spaces that may not be capable of being completely enclosed.

Having determined that the ordinary meaning of the word "chamber" encompasses both completely and partially enclosed spaces, the Court must turn to the specification and relevant

16

prosecution history to determine whether that definition is inconsistent with the specification and history. *See Texas Digital Systems, Inc.*, 308 F.3d at 1204 ("Moreover, the intrinsic record also must be examined in every case to determine whether the presumption of ordinary and customary meaning is rebutted."). According to Plaintiff, "[f]igure 12 of the patent shows a bladder containing a single chamber with an orifice that allows the passage of fluid or air." Plaintiff's Claim Const. Brief, at 9. Furthermore, Plaintiff argues that "[f]igure 12A also discloses a multi-chambered bladder that uses a valve **525** to allow air or fluid to pass from one chamber to the other." *Id.* at 10. Thus, Plaintiff argues, "the '504 patent discloses two embodiments of the invention in which the chambers are not entirely separated or distinct." *Id.* Because the specification describes at least two situations where fluid passes between chambers, Plaintiff argues, Defendant's construction of the word "chamber" to require an enclosed space is too narrow and is inconsistent with the specification.

Defendant responds by arguing that contrary to Plaintiff's assertions, the '504 patent never describes a "chamber" that is not completely enclosed. According to Defendant, the valve **525** only allows fluid to be transferred between two different "containers" **515** and **518**. *See* '504 patent, at col. 28, lines 52-53 (describing **515** and **518** as "two containers."). Thus, Defendant asserts that because the '504 patent describes "containers" that allow fluid or air to pass between them, the term "chamber" must refer only to enclosed spaces as described in the specification.

The Court finds Defendant's argument unpersuasive. Although the '504 patent refers to **518** as an inner container, at one point it also refers to **515** as a bladder and **518** as a "single chamber." '504 patent, at col. 29, lines 20-21. Thus, the terms "container" and "chamber" are used interchangeably in the written description. Therefore, Plaintiff is correct in its assertion that the '504 patent contemplates fluid communication between a "chamber" and a "container," and that the word

17

"chamber" is not used exclusively in the specification to refer to a completely enclosed space, as Defendant argues.

Nevertheless, Defendant asserts that container **518** is involved with adjusting the stiffness of the seat and "not . . . in measuring the weight of the occupant." Defendant's *Markman* brief, at 11, n. 40. Thus, Defendant appears to argue that the word "chamber" should be construed to mean a totally enclosed space when it is used to describe part of a weight measuring device, but not when it is used to describe inner container **518**, which does not measure weight. The Court, however, is not persuaded that the patentee chose to ascribe two different meanings to the word "chamber" depending upon whether the chamber is used for measuring weight or adjusting stiffness based on weight. Therefore, the Court finds that Plaintiff's construction of the word "chamber" using the ordinary meaning of the word is not inconsistent with the '504 patent specification or prosecution history.[3] Accordingly, the Court construes "plurality of chambers" to mean "a plurality of partially or totally enclosed spaces or compartments."

## 2.    "Weight Distribution of the Occupant"

Claims 7 - 9 require determining the "weight distribution of the occupant." Plaintiff argues that "weight distribution of the occupant" means "weight of the occupant over the surface of the seat portion of the seat over time." Plaintiff's Claim Construction Brief, at 11. Defendant argues that "weight distribution of the occupant" means "the apportionment of an occupant's weight over the surface of the seat." Defendant's *Markman* Brief Regarding Claim Construction, at 13. Thus, the

---

[3] Neither party has asserted that the prosecution history of the '504 patent is relevant to determining the meaning of the term "plurality of chambers." Nevertheless, the Court has reviewed the prosecution history and finds that Plaintiff's construction of "plurality of chambers" is not inconsistent with it.

18

dispute with respect to this claim term centers around whether "weight distribution" involves a consideration of time.

Both parties cite the same dictionary definition of "distribution." According to the parties, "distribution" means "the position, arrangement, or frequency of occurrence over an area or throughout a space or unit of time." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 368 (1991), attached as Plaintiff's Ex. L and Defendant's Ex. 3. Thus, "distribution" can mean "position ... over an area[,]" as Defendant argues, or "position ... throughout a ... unit of time[,]" as Plaintiff argues. *Id.* Each party argues that its proposed definition finds more support in the '504 patent specification.

Defendant argues that nowhere in the specification is there any reference to apportionment of weight over time. Furthermore, according to Defendant, none of the three inventors of the invention disclosed in the '504 patent described weight distribution as anything other than the apportionment of an occupant's weight over the seat. *See* Breed Dep. at 82; Morin Dep. at 94-95; DuVall Dep. at 26; 33. Thus, Defendant argues that Plaintiff is seeking an unnecessarily broad definition encompassing not only apportionment of weight over the surface of the seat at a given instant, but also apportionment of weight over the surface of the seat over time.

Plaintiff responds by pointing to an extensive discussion of a preferred embodiment in the '504 patent involving a neural network. The neural network generates an algorithm to determine the "seated-state of a passenger" by first training the neural network. '540 patent, at col. 18, line 60. The neural network is trained by inputting thousands of data points, or vectors, reflecting the various positions of a child or adult in the seat. *Id.* at col. 18, line 60 to col. 19, line 54. Once the network is trained, according to Plaintiff, the network is capable of determining the "seated state" of the passenger of a car over time while that car is traveling. Determining the "seated-state," as that term

19

is used in the specification, includes determining a passenger's apportionment of weight over the surface of the seat. *See id.* at col. 1, line 62 to col. 2, line 3 ("[D]epending on the seated state of an occupant, there are cases where the life of the occupant cannot be saved even by present airbag systems. For example, when . . . the passenger is out of position and near the deployment door of the airbag . . . ."); *see also id.* at col. 7, lines 38-40 ("The position of the occupant and the center-of-gravity of the occupant can also be determined based on the weight distribution."). Plaintiff also relies on the discussion of the neural network in the following portion of the specification to support its proposed construction:

> Instead of measuring the height and weight of the occupant, it is also possible to measure a combination of any two morphological characteristics during a training phase, derive a relationship between the occupancy of the seat, e.g., adult occupant, child occupant, etc., and the data of the two morphological characteristic (sic). This relationship may be embodied within a neural network so that *during use*, by measuring the two morphological characteristics, the occupancy of the seat can be determined.

'504 patent, at col. 26, line 66 to col. 27, line 6 (emphasis added). Plaintiff argues that because the specification refers to measuring a morphological characteristic such as weight "during use," the term "weight distribution" must necessarily encompass a time component.

The Court finds Plaintiff's arguments unpersuasive. "Because words often have multiple dictionary definitions, some having no relation to the claimed invention, the intrinsic record must always be consulted to identify which of the different possible dictionary meanings of the claim terms in issue is most consistent with the use of the words by the inventor." *Texas Digital Systems, Inc.*, 308 F.3d at 1203. The Court finds no support in the specification for Plaintiff's assertion that "weight distribution" means "weight of the occupant over the surface of the seat portion of the seat

over time." Specifically, Plaintiff's reliance upon the neural network to determine the occupant's

seated-state fails to support its proposed construction. It is undisputed that the neural network or any

other processor must take multiple readings of weight distribution over time in order to determine

whether or not that weight distribution has changed. That does not mean, however, that the term

"weight distribution" should be limited to weight as it is distributed over the seat over time. The

dictionary definition offered by both parties defines "distribution" to mean "the position,

arrangement, or frequency of occurrence . . . *throughout* a . . . unit of time." WEBSTER'S NINTH NEW

COLLEGIATE DICTIONARY 368 (1991) (emphasis added), attached as Plaintiff's Ex. L and

Defendant's Ex. 3. Thus, a particular "distribution" under that definition would be the position or

arrangement of weight throughout a unit of time. In other words, four different arrangements or

positions of weight in a given time period would constitute one "weight distribution" for that time

period. Plaintiff has failed to demonstrate that any portion of the specification contemplates such

a meaning. Instead, as Defendant points out, the specification and the claims refer solely to "weight

distribution" in terms of the apportionment of an individual's weight over the surface of the seat area

even though a processor means may take multiple readings of that weight distribution over time.

Accordingly, the Court construes "weight distribution" to mean "the apportionment of an occupant's

weight over the surface of the seat."

### 3.    "Position of the Occupant"

The words "position of the occupant" appear in claims 8 and 10. Plaintiff argues that

"position of the occupant" means "a position where the occupant can attain the beneficial restraining

effects of an occupant protection apparatus." Plaintiff's Claim Construction Brief, at 12. Defendant

argues that "position of the occupant" means "position of the seat occupant's body, including the

21

upper torso, relative to an airbag door." Defendant's *Markman* Brief Regarding Claim Construction,

at 14. Each party argues that its respective definition is more consistent with the '504 patent

specification.

Plaintiff's proposed definition arises from the inverse of a definition of "out-of-position"

contained within the '504 patent specification. The specification defines "out-of-position" to mean:

> that the occupant, either the driver or a passenger, is sufficiently close
> to the occupant protection apparatus (airbag) prior to deployment that
> he or she is likely to be more seriously injured by the deployment
> event itself than by the accident. It may also mean that the occupant
> is not positioned appropriately in order to attain the beneficial,
> restraining effects of the deployment of the airbag.

'504 patent, at col. 5, lines 37-40. Thus, according to Plaintiff, since "out-of position" means "not

positioned appropriately in order to attain the beneficial restraining effects of the deployment of the

airbag," the term "position of the occupant" must mean "where the occupant can attain the beneficial

restraining effects of an occupant protection apparatus."

Defendant responds by arguing that Plaintiff's definition is inconsistent with both the

ordinary meaning of the word "position" and the testimony of '504 patent inventors Breed and

DuVall, who each agreed that "position of the occupant" essentially means the location of the

occupant, including the occupant's torso, relative to the airbag door or some other fixed point. *See*

Breed Dep. at p. 117; DuVall Dep. at pp. 34 - 35. Furthermore, Plaintiff's own expert asserts that

"position of the occupant" is determined relative to the air bag door. *See* Dix Decl. at ¶ 21

("Furthermore, it is my opinion that one of ordinary skill in the art could read the specification and

of the '504 patent and the related patents and understand that the inventors were referring *especially*

*to the proximity of the occupant to the air bag deployment surface*."). Thus, Defendant argues that

"position of the argument" means "position of the seat occupant's body, including the upper torso, relative to an airbag door."

The Court finds Defendant's proposed definition to be consistent with the ordinary meaning of the word "position." Plaintiff's proposed definition based on the inverse of "out-of-position" fails because the specification does not limit use of the word "position" to situations where the occupant's body can attain beneficial restraining effects. For instance, the specification states that "[t]he position of the occupant and the center of gravity of the occupant can also be determined based on the weight distribution." '504 patent, at col. 7, lines 38-40. Thus, the specification refers to "position of the occupant" in a general sense. In addition, claims 8 and 10 refer generally to the "position of the occupant," not to determining whether a person is in-position versus out-of-position. The Court finds that Plaintiff's attempt to restrict the definition of "position" based on the definition of "out-of-position" is inconsistent with the specification and the language of claims 8 and 10. Accordingly, the Court will construe "position of the occupant" to mean the point or area in space actually occupied by the occupant relative to the air bag door. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1769 (1981).

### 4.    "Center of Gravity of the Occupant"

The words "center of gravity" appear in claim 9. Defendant argues that "center of gravity" means "the point at which the entire weight of a body may be considered as concentrated so that if supported at this point the body would remain in equilibrium in any position." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 221 (1991); Defendant's *Markman* Brief Regarding Claim Construction, at 15. Plaintiff argues that "center of gravity" means "the point at the seat in which the entire weight of the occupant can be considered as concentrated." Defendant's proposed

23

definition is based on a dictionary definition, while Plaintiff's proposed definition is based on the declaration of its expert witness, Professor Rollin Dix. According to Mr. Dix, "[w]ithin the motor vehicle field, the height location of the center of gravity is necessary to evaluate braking, but for static weight distribution on the wheels, only its fore-and-aft position is required." Dix Decl. at ¶ 34. Thus, the difference between the two definitions is in the number of dimensions in which the center of gravity is determined. In Defendant's definition, center of gravity is determined in three dimensions. In Plaintiff's definition, center of gravity is determined in two dimensions.

The Court finds Defendant's definition persuasive. Plaintiff has failed to identify any portion of the '504 patent which indicates that the ordinary dictionary definition of the words "center of gravity" should be rejected in favor of the definition provided by Plaintiff's expert witness. *See Bell Atlantic Network Serv's Inc. v. Covad Communications Group, Inc.*, 262 F.3d 1258, 1269-70 (Fed. Cir. 2001) ("If the meaning of the claim term is apparent from the intrinsic evidence alone, it is improper to rely on extrinsic evidence other than that used to ascertain the ordinary meaning of the claim limitation."); *see also Vitronics Corp.*, 90 F.3d at 1584 ("Indeed, where the patent documents are unambiguous, expert testimony regarding the meaning of a claim is entitled to no weight."). Furthermore, Professor Dix's explanation of center of gravity relevant to the "motor vehicle field" is entitled to even less weight because the seat described in the '504 patent may be a type of seat used "in non-transportation applications." '504 patent, at col. 15, lines 25-29. Finally, David Breed, the inventor of the weight sensing system described in the '504 patent, admitted that center of gravity is a three-dimensional concept. *See* Breed Dep. at 123. Accordingly, the Court will construe "center of gravity" to mean "the point at which the entire weight of a body may be concentrated so that if supported at this point the body would remain in equilibrium in any position." *See* WEBSTER'S

24

NINTH NEW COLLEGIATE DICTIONARY 221 (1991).

### 5.    "Seat"

The parties also dispute the meaning of the word "seat." Plaintiff argues that "seat" means "automobile seat having a seat portion and a back portion." Plaintiff's Claim Construction Brief, at 11. Defendant argues that "seat" simply means "a chair, stool, or bench intended to be sat in or on." Defendant's *Markman* Brief Regarding Claim Construction, at 3. Plaintiff argues that its definition is consistent with the overall context of the '504 patent. Defendant argues that its definition is consistent with the ordinary meaning of the word "seat," and, furthermore, that Plaintiff's definition improperly limits the meaning of the word "seat" to comport with one embodiment of the invention described in the '504 patent.

Plaintiff argues that "seat" should mean an automobile seat with a seat portion and a back portion for two reasons. First, the '504 patent discloses an automobile seat and "no other type of seat is contemplated by the specification [or] the claims." Plaintiff's Claim Construction Brief, at 11. *See Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331-32 (Fed. Cir. 2001) (citations omitted) (Courts should look to the specification "to ascertain the meaning of the claim term as it is used by the inventor in the context of the entirety of his invention . . . ."). Second, because the asserted claims refer to the "seat portion of the seat," the word "seat" must be defined to include a back portion. Plaintiff argues that "portion of the seat" necessarily refers to a back portion because without a back portion, an individual would be "knocked over" by the deployment of an airbag. *See* Plaintiff's June 14, 2004, Response Brief, at 12. Moreover, according to Plaintiff, "seat" must be defined to include a back portion because the preambles of the asserted claims refer to the "occupant" of a seat, which refers to a type of seat that is sat in, not on.

Defendant argues that a broad dictionary definition should apply in the absence of a clear language contained in the claims or specification limiting the word "seat" to an automobile seat with a seat portion and back portion. Furthermore, Defendant argues that claim language should not be limited to exclude certain devices, such as a seat without a back portion, simply because a seat without a back portion may not serve the perceived purpose of the invention. *See E-Pass Technologies v. 3Com Corp.*, 343 F.3d 1364, 1370 (Fed. Cir. 2003). The Court finds Defendant's argument persuasive.

As the Federal Circuit has noted:

> Claim terms take on their ordinary and accustomed meanings unless the patentee demonstrated an intent to deviate from the ordinary and accustomed meaning of a claim term by redefining the term or by characterizing the invention in the intrinsic evidence *using words or expressions of manifest exclusion or restriction, representing clear disavowal of claim scope.*

*Teleflex v. Ficosa North America Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002) (emphasis added); *see also Innova/Pure Water, Inc. v. Safari Water Filtration*, __ F.3d __, 2004 WL 1780928 (Fed. Cir. Aug. 11, 2004) (citations omitted) ("Accordingly, particular embodiments appearing in the written description will not be used to limit claim language that has a broader effect. And, even where a patent describes only a single embodiment, claims will not be 'read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction.'"). Although the specification often refers to automobile passengers and automobile seats, neither the specification nor the claim terms clearly limit the word "seat" to an automobile seat. Rather, the specification and claims do exactly the opposite. For instance, as noted above, at column 15 the specification states that "[t]he seat 1 may be the driver seat, the front

26

passenger seat or any other seat in a motor vehicle as well as other seats in transportation vehicles *or seats in non-transportation applications.*" '504 patent, at col. 15, lines 25-29 (emphasis added). In addition, the specification also includes the following broad language:

> Although several preferred embodiments are illustrated and described above, there are other possible combinations using different sensors which measure either the same or different morphological characteristics, such as knee position, of an occupant to accomplish the same or similar goals as those described herein. *There are also numerous additional applications in addition to those described above. This invention is not limited to the above embodiments and should be determined by the following claims.*

'504 patent, at col. 31, lines 57-65 (emphasis added). Looking to the claims, as suggested by the above-quoted paragraph, reveals that the inventors did not limit the word "seat" to automobile seats as it is used in the asserted claims because in the non-asserted claims, claims 12 - 20, the inventors explicitly use the words "seat in a vehicle." *See e.g.* '504 patent, claim 12 ("An apparatus for adjusting the stiffness of a seat in a vehicle . . . ."). Finally, the Court finds unpersuasive Plaintiff's explanation that the word "seat" must be defined to include a back portion due to airbag deployment. Using the claimed invention in conjunction with an airbag is only one embodiment of what is more generally titled "Apparatus and Method for Measuring Weight of an Object in a Seat." To read a limitation into the claims based upon one embodiment describing the use of an air bag would be error. *See Comark Communications, Inc. v. Harris Corp.,* 156 F.3d 1182, 1186 (Fed. Cir. 1998) ("[L]imitations from the specification are not to be read into the claims . . . ."). Accordingly, the Court construes "seat" to mean "something intended to be sat in or on." *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2049 (1981).[4]

---

[4] The Court also rejects Plaintiff's argument that use of the word "occupant" limits use of the word "seat" in the '504 patent only to seats which may sat in. The word "occupant" means

27

6.    **"Determining the Weight"**

The words "determining the weight" appear in the preambles of claims 1 and 5. Plaintiff argues that "determining the weight" should be construed to mean "determining whether a measured pressure is above or below a reference value." Plaintiff's Claim Construction Brief, at 17. Defendant argues that "determining the weight" should be construed to mean "to calculate the force with which an occupant's body is attracted to the earth." Defendant's Response in Opposition to Plaintiff's Proposed Construction of Claims, at 9. Plaintiff argues that its definition is supported by the function of the invention, which, according to Plaintiff, measures pressure and converts that measurement to a theoretical or numerical "weight" by comparing the measured pressure to a reference value. Defendant, on the other hand, argues that its definition is simply based on the ordinary dictionary meaning of the words "weight" and "determine." Neither definition will be addressed, however, because the Court finds that the preambles of claims 1 and 5 do not limit any of the asserted claims.

"In general, a preamble limits the [claimed] invention if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim." *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339) (quoting *Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002)). "[A] claim preamble has the import that the claim as a whole

---

simply "one who occupies a particular place or premises." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1560 (1981). A person may occupy a bench or a stool; thus, use of the word "occupant" does not limit "seat" in the '504 patent to only seats which may be sat in. Furthermore, the word "occupant" only appears in the preamble of the asserted claims and, therefore, does not limit those claims. *See Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808-809 (Fed. Cir. 2002) (quotation omitted) ("[A] preamble is not limiting where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention."); *see also* **Part IV.A.6**, *supra.*

suggests for it. In other words, when the claim drafter chooses to use both the preamble and the body to define the subject matter of the claimed invention, the invention so defined, and not some other, is the one the patent protects." *Eaton Corp.*, 323 F.3d at 1339 (quoting *Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 620 (Fed. Cir. 1995)). Furthermore, "[w]hen limitations in body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention." *Id.* A preamble is not limiting, however, "where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention." *Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808-809 (Fed. Cir. 2002).

The preamble of claim 1 recites a "weight sensor for determining the weight of an occupant . . . ." '504 patent, at col. 32, lines 9-10. The preamble of claim 5 recites a "method for determining the weight of the occupant of a seat . . . ." *Id.* at col. 32, lines 28-29. Thus, the phrasing of the preambles indicates that both preambles are merely setting forth the purpose of the claimed inventions, *i.e.*, to determine occupant weight. Moreover, the preambles do not add any structure or particular meaning to the body of either claim. *See, e.g., Eaton Corp.*, 323 F.3d at 1340 ("The method steps of claim 14 thus require the manipulation of particular structures that are identified and described only by the preamble, during a particular sequence of events defined only by the preamble."). Accordingly, the Court finds that the preambles of claims 1 and 5 do not limit any of the asserted claims; thus, the Court need not construe "determining the weight."

### 7.    "Processor Means"

The term "processor means" appears in Claim 10 of the patent-in-suit. The word "means" creates a presumption that a "means-plus-function" interpretation under 35 U.S.C. § 112, ¶ 6, is

29

required. *See Kemco Sales, Inc. v. Control Papers, Co.*, 208 F.3d 1352, 1361 (Fed. Cir. 2000).

Section 112, ¶ 6, provides as follows:

> An element in a claim for a combination may be expressed as a
> means or step for performing a specified function without the recital
> of structure, material, or acts in support thereof, and such claim shall
> be construed to cover the corresponding structure, material, or acts
> described in the specification and equivalents thereof.

35 U.S.C. § 112, ¶ 6. "Once a court establishes that a means-plus-function limitation is at issue, it

must construe that limitation, thereby determining what the claimed function is and what structures

disclosed in the written description correspond to the 'means' for performing that function." *Kemco*

*Sales, Inc.*, 208 F.3d at 1360. It is undisputed that the words "processor means" must be construed

under § 112.

Plaintiff proposes the following construction of the term "processor means:"

> Function: to receive the determined weight of the occupant from the
> weight sensor and determine the position of the occupant.
>
> Corresponding Structure: control circuit or module.

Plaintiff's Claim Construction Brief, at 19. Defendant proposes a slightly different construction of

the term "processor means:"

> A microprocessor that receives inputs from several sensors and uses
> a neural network. The microprocessor/neural network combination
> must perform the exact functions of (i) 'receiving the determined
> weight of the occupant' and (ii) 'determining the position of the
> occupant.'

Defendant's *Markman* Brief, at 15. There is no dispute as to function of the "processor means,"

which both parties agree is to receive the determined weight of the occupant and determine the

position of the occupant. The parties dispute, however, the structure corresponding to the function.

30

Defendant asserts that the corresponding structure is a microprocessor in combination with a neural network. Plaintiff asserts that the corresponding structure is a control circuit or module.

"[S]tructure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *B. Braun Medical, Inc. v. Abbott Lab's*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). Moreover, "structural features that do not actually perform the recited function do not constitute corresponding structure and thus do not serve as claim limitations." *Asyst Technologies, Inc. v. Empak, Inc.*, 268 F.3d 1364, 1370 (Fed. Cir. 2001) (citations omitted). The Court finds that Defendant is correct in its assertion that the specification clearly links a neural network to the function of the "processor means."

The specification describes the term "processor means" as follows:

> The processor means may comprise a microcomputer into which a function correlating the outputs from the wave receiving sensor and the weight measuring means and the seated-state of the seat is incorporated *or* a neural network which generates a function correlating the outputs from the wave-receiving sensor and the weight measuring means and the seated-state of the seat *and executes the function* using the outputs from the wave-receiving sensor and the weight measuring means as input to determine the seated-state of the seat.

'504 patent, col. 8, lines 37-47 (emphasis added). In the preceding quotation, the neural network is described as not only generating a function but also executing the function using the outputs from a wave-receiving sensor and "the weight measuring means . . . to determine the seated-state of the seat." *Id.* The "seated-state," according to the specification, includes the position of the occupant. *See id.* col. 1, line 62 to col. 2, line 3 ("[D]epending on the seated state of an occupant, there are

31

cases where the life of the occupant cannot be saved even by present airbag systems. For example, when . . . the passenger is out of position and near the deployment door of the airbag . . . ."). Thus, the neural network performs the recited functions of "receiving the determined weight of the occupant" and "determining the position of the occupant." It receives the determined weight of the occupant because it executes the correlation function "using the outputs from the wave-receiving sensor and the weight measuring means as input." '504 patent, col. 8, lines 45-47.    It also determines the position of the occupant because it uses the wave sensor and weight sensor inputs "to determine the seated-state of the seat," which includes the position of the occupant. Accordingly, the Court finds that the neural network is clearly linked to the functions recited in Claim 10.

The remaining issue is whether any other structure corresponds to the term "processor means." Plaintiff argues that the structure corresponding to "processor means" includes "a control circuit or module, or any equivalents." See Plaintiff's June 14, 2004, Claim Construction Response Brief, at 18. Defendant argues that structure corresponding to "processor means" includes only a microprocessor in combination with a neural network. See Defendant's *Markman* Brief, at 15.

As noted above, the Court has already found that the specification describes clearly links the function of the "processor means" to a neural network. In addition, the Court finds that the specification clearly links a microprocessor and a microprocessor that is being used as an "evaluation circuit" to the functions described in Claim 10. See '504 patent, at col. 8, lines 37- 42 ("The processor means may comprise a microcomputer into which a function correlating the outputs from the wave sensor and the weight measuring means and seated-state of the seat is incorporated . . . ."); *id.* at col 10, lines 21-23 ("The processor means may be a single microprocessor for performing all of the functions described above."); *id.* at col 10, lines 36-40 ("The correlation function or state that

32

is determined by employing this neural network may also be contained in a microcomputer. In this case, the microcomputer can be employed as an evaluation circuit."). The Court, however, rejects Plaintiff's assertion that a "control circuit or module" is corresponding structure. The '504 patent describes a "control circuit or module 150" as a control means for adjusting certain parts of a seat, such as the headrest, based on an occupant's height. *See id.* at col. 23, lines 51-56; col. 24, lines 15-65. In addition, a "control circuit" is also described as structure used to regulate the flow of medium into the outer container to adjust the stiffness of the seat based upon the occupant's weight. *See id.* at col. 7, lines 60-64; col. 28, lines 25-45. Thus, while a control circuit or module may "receive the determined weight" in the course of adjusting the stiffness of the seat, and possibly determine occupant height, there is no mention of a control circuit or module determining the position of the occupant. Accordingly, the Court construes processor means to have the following function and structure:

> Function: to receive the determined weight of the occupant from the weight sensor and determine the position of the occupant.
>
> Structure: A microprocessor, evaluation circuit, neural network, or neural network/microprocessor combination, and any equivalents.

Accordingly, now that the disputed claim language has been construed, the Court will address infringement and invalidity.

## B.    Infringement

The question of infringement requires a comparison of the asserted claims with the allegedly infringing device. *See Kemco Sales, Inc. v. Control Papers Co.*, 208 F.3d 1352, 1359 (Fed. Cir. 2000). To prove infringement, the patentee must establish that the accused device contains each limitation of the asserted claim or an equivalent of each limitation. *See Catalina Marketing Int'l,*

33

*Inc. v. Coolsavings.com*, 289 F.3d 801, 812 (Fed. Cir. 2002). A finding of literal infringement requires that the accused device embody exactly each limitation of the asserted claim. *See Laitram Corp v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991). "The absence of a single limitation . . . from the accused device precludes a finding of literal infringement." *Kahn v. General Motors Corp.*, 135 F.3d 1472, 1477 (Fed. Cir. 1998).

A product may also infringe if it is equivalent, though not identical to a claim limitation. "The doctrine of equivalents allows the patentee to claim those insubstantial alterations that were not captured in drafting the original patent claim but which could be created through trivial changes." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 733 (2002). "An element in the accused device is equivalent to a claim limitation if the only differences between the two are insubstantial." *Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1139 (Fed. Cir. 2004) (citing *Eagle Comtronics, Inc. v. Arrow Communication Labs., Inc.* 305 F.3d 1303, 1315 (Fed. Cir. 2002)). The determination of infringement, both literal and under the doctrine of equivalents, is often a question of fact. *See Teleflex, Inc. v. Ficosa North America Corp.*, 299 F.3d 1313, 1323 (Fed. Cir. 2002).

Summary judgment of no infringement is appropriate, however, when, construing the facts in a light most favorable to the nonmovant, no reasonable jury could find that the accused product meets every limitation recited in the properly construed claims. *See Catalina Marketing Int'l Inc.*, 289 F.3d at 812, (citing *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998)). In other words, summary judgment of noninfringement is appropriate "where the patent owner's proof is deficient in meeting an essential part of the legal standard for infringement, because such failure will render all other facts immaterial." *TechSearch L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1369-70 (Fed.

34

Cir. 2002); *see also Novartis Corp. v. Ben Venue*, 271 F.3d 1043, 1046 (Fed. Cir. 2001) ("Since the ultimate burden of proving infringement rests with the patentee, an accused infringer seeking summary judgment of noninfringement may meet its initial responsibility either by providing evidence that would preclude a finding of infringement, or by showing that the evidence on file fails to establish a material issue of fact essential to the patentee's case."). "Accordingly, infringement must be shown . . . for each claim limitation; general assertions of facts, general denials, and conclusory statements are insufficient to shoulder the non-movant's burden." *Techsearch L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1372 (Fed. Cir. 2002).

Plaintiff argues that the PODS-B product embodies each limitation of the asserted '504 patent claims. Defendant responds by arguing that with respect to claims 2 and 6-11, its product lacks several key elements of the subject claims, including a "plurality of chambers" and the ability to determine "weight," "weight distribution," "position of the occupant," and "center of gravity." Neither party has offered any substantial argument regarding the doctrine of equivalents. Nevertheless, the Court will address infringement, both literal and equivalent, with respect to each asserted claim and determine whether (1) Plaintiff is entitled to summary judgment of infringement, (2) Defendant is entitled to summary judgment of noninfringement, or (3) a genuine issue of material fact exists for trial.

### 1.  Claims 1-2 and 4-6

Plaintiff has moved for summary judgment of infringement with respect to claims 1-2, and 4-6. Defendant has moved for summary judgment of noninfringement with respect to claims 2 and 6. In addition, Defendant argues that it has established a genuine issue of material fact with respect to infringement of claims 1 and 5.

35

With claim 1 the patentee claimed "a weight sensor for determining the weight of an occupant of a seat, comprising a bladder having at least one chamber adapted to be arranged in a seat portion of a seat, and at least one transducer for measuring the pressure in a respective one of said at least one chamber." '504 patent, at col. 32, lines 9-15. Claims 2 and 4 are dependent on claim 1. Claim 2 recites "[t]he weight sensor of claim 1, wherein said bladder comprises a plurality of chambers, each of said chambers being adapted to be arranged at a different location in the seat portion of the seat." *Id.* at col. 32, lines 16-18. Claim 4 recites "[t]he weight sensor of claim 1, wherein said bladder consists of a single chamber." *Id.* at col. 32, lines 26-27.

Claim 5 is an independent method claim. With claim 5, the patentee claimed "a method for determining the weight of an occupant of a seat, comprising the steps of: arranging a bladder having at least one chamber in a seat portion of the seat, and measuring the pressure in each of the at least one chamber whereby the weight of the occupant is obtainable from the measured pressure in each of the at least one chamber." *Id.* at col. 32, lines 28-35. Claim 6 is dependent on claim 5 and it recites "[t]he method of claim 5, wherein said bladder comprises a plurality of chambers, further comprising the step of: arranging each of the chambers at a different location in the seat portion of the seat." *Id.* at col. 32, lines 36-39.

Claims 2 and 6, both recite a "plurality of chambers." Defendant argues that it is entitled to summary judgment with respect to these two claims because fluid flows freely throughout the PODS-B bladder; thus, the bladder is not comprised of a "plurality of chambers." As for the remaining claims, Defendant argues that it has established a genuine issue of material fact because all of these claims, as well as claims 2 and 6, disclose a device for "determining the weight of an occupant." Defendant argues that the PODS-B product only measures the pressure exerted on the

36

bladder by the occupant; it does not convert that pressure into "weight," thus, according to Defendant, it does not determine weight.

Plaintiff responds with two arguments. First, Plaintiff argues that Defendant has repeatedly marketed its PODS-B product as a device that senses the weight of an occupant. Second, Plaintiff argues that the plurality of "cells" used in the PODS-B bladder constitute a "plurality of chambers." Plaintiff argues that because the PODS-B bladder uses a plurality of chambers and Defendant's own documents reveal that the PODS-B product measures weight, Defendant has failed to raise a genuine issue of material fact with respect to infringement of claims 1-2 and 4-6.

The Court finds that Defendant is not entitled to summary judgment of non-infringement of claims 2 and 6. The Court has construed "plurality of chambers" to mean a plurality of partially or totally enclosed spaces or compartments. Therefore, because the raised areas within the PODS-B bladder can be considered "chambers" under the Court's definition, Defendant is not entitled to summary judgment of non-infringement of claims 2 and 6. By the same token, however, Defendant is entitled to summary judgment of noninfringement with respect to claim 4, which requires the bladder to consist of a single chamber only.

With respect to claims 1-2 and 5-6, however, the Court finds that Plaintiff is entitled to summary judgment. Although Defendant argues that claims 1-2 and 5-6 each describe a sensor for determining weight, and it disputes whether the PODS-B product determines weight, the phrase "determining the weight" appears only in the preamble of the independent claims. As the Court determined in **Part IV.A.6.** *supra,* claims 1-2 and 5-6 are not limited by their preambles. Accordingly, based on (1) the Court's finding that the PODS-B product embodies a "plurality of chambers" and (2) the absence of claim language limiting claims 1-2 and 5-6 to "determining the

37

weight of an occupant," the Court finds that Plaintiff is entitled to summary judgment of infringement with respect to claims 1-2 and 5-6. However, as addressed in **Part IV.C,** *infra,* the Court finds these claims to be invalid.

### 2. Claims 7, 8, and 9

Plaintiff and Defendant have both moved for summary judgment with respect to claims 7, 8 and 9. Claim 7 recites "a method for determining the weight distribution of the occupant in a seat, comprising the steps of: arranging a bladder having a plurality of chambers in a seat portion of the seat, measuring the pressure in each of the chambers, and determining the weight distribution of the occupant from the measured pressure in each of the chambers." Claims 8 and 9 depend from claim 7. Claim 8 recites "[t]he method of claim 7, further comprising the step of: determining the position of the occupant based on the weight distribution." Claim 9 recites "[t]he method of claim 7, further comprising the step of: determining the center of gravity of the occupant based on the weight distribution." Thus, claim 7 recites a method of determining the weight distribution of the occupant by measuring the pressure in each of a plurality of chambers, and claims 8 and 9 recite a method of determining the position of the occupant and the center of gravity of the occupant from that weight distribution.

Defendant maintains that the PODS-B product only determines whether the pressure exerted on the bladder is above or below a threshold value; it does not determine weight distribution, position of the occupant, or center of gravity of the occupant. Plaintiff responds by arguing that the PODS-B product determines weight distribution because Defendant conducted extensive "out-of-position" testing in order to develop a database of occupant positions. Plaintiff argues that this database allows the PODS-B ECU to determine the weight distribution, position, and center of

38

gravity of an occupant. In addition, Plaintiff argues that certain features of the PODS-B product designed to filter out false readings above or below the threshold value as a result of occupant movement also support a finding that the PODS-B product determines weight distribution, position of the occupant, and center of gravity. Defendant, however, contends that it undertook "out-of-position" testing in order to ensure that the PODS-B system sends the correct signal to the vehicle's airbag control module regardless of a particular occupant's weight distribution, position, or center of gravity. Furthermore, Defendant argues that filtering out false readings above or below the threshold value only involves pressure measurements, not weight distribution, position, or center of gravity.

The Court finds Defendant's arguments persuasive. Plaintiff purports to rely on the deposition testimony of one of Defendant's engineers, Duane Fortune, to support its assertion that Defendant's out-of-position testing allows the PODS-B product determine weight distribution of the occupant. Mr. Fortune, however, never testified that the out-of-position testing allows the PODS-B product to determine weight distribution. Rather, Mr. Fortune repeatedly emphasized that the testing was only conducted to ensure that an air bag would deploy for a small adult female occupant, also referred to as a "5th percentile" female, but would not deploy for a child, regardless of the occupant's weight distribution, position, or center of gravity. For instance, Mr. Fortune testified that the out-of-position testing results "are analyzed to determine *a threshold condition or pressure* for which a 5th percentile *in various positions* and larger occupant would be given an Airbag Allow condition from our controller." Fortune Dep. at 31. Mr. Fortune further testified that the various occupant positions used during the testing "were agreed to between Delphi and Ford to evaluate our system output, with the goal of the system output being a threshold that's in the ECU or in the system where the

39

occupant, *in any of these positions*, would still be above that threshold for a 5th percentile." *Id.* at 34. In addition, Defendant's Technical Manager, Charles Gray, testified that after the testing was finished, Defendant did not change the classification algorithm that the ECU uses to determine whether or not to allow or inhibit deployment of the air bag based on measured pressure. *See* Gray Dep., at 24. Thus, contrary to Plaintiff's assertion, Defendant's employees did not testify that the PODS-B product is capable of determining weight distribution, position, or center of gravity of the occupant.

The testimony of Defendant's engineers is also consistent with the voluminous documents regarding out-of-position testing obtained by Plaintiff during discovery. For example, Defendant describes the PODS-B system as enabling deployment of an airbag for all "[p]roperly seated 5th [percentile] females and larger for all seat back angles and all seat travel positions, *including* various out of position seating." Exhibits in Support of Plaintiff's Reply Brief in Support of its Motion for Summary Judgment of Infringement, at Doc. 6, D006761; *see also* Doc. 13, D004217 (detailing Defendant's efforts "[t]o determine a bladder geometry that will result in the lowest output variation as a function of position."). Moreover, rather than determine the occupant's position within the vehicle using wave sensors or other devices, the PODS-B system appears to simply rely on the nature of bladder to avoid airbag deployment in unsafe situations. For instance, if a person is sitting too far forward, or too far to the left or right, or has his or her seat reclined, less weight will be applied to the bladder and the PODS-B system will be less likely to allow deployment. *See id.* at Ex. A, D007007; *see also* Doc. 2, D006627. Not allowing deployment because the sensed pressure is below a given threshold, however, does not amount to actually determining an occupant's position relative to the airbag deployment surface. *See* Exhibits in Support of Plaintiff's Motion for Partial

40

Summary Judgment on Infringement, at Ex. O, D003628 (noting that the PODS-B system is not "capable of monitoring the seating position of the occupant, nor can [it] determine the proximity of the occupant to the inflator module(s).")

Similarly unpersuasive is Plaintiff's contention that certain features of the PODS-B system that compensate for false readings above or below the threshold value also demonstrate that the system determines weight distribution, position, and center of gravity. The PODS-B product employs three features to filter out false readings: (1) the Ride-Learn function; (2) the Adult-Lock function; and (3) the Child-Lock function. The Ride-Learn function moves the classification threshold down over a period of time when the system senses an occupant whose weight causes a pressure reading only slightly above the threshold. According to Mr. Gray, moving the threshold down slightly over time "increases the stability of the system" and avoids repeated changes in occupant classification due to movement by the occupant. *See* Gray Dep. at 39-40. Similarly, the Adult-Lock function also lowers the classification threshold, but for a different reason. The Adult-Lock function lowers the threshold after the system senses a pressure reading considerably above the threshold for more than 60 seconds, thereby allowing the system to compensate for an adult who moves out of position by, for example, reclining the seat. *See id.* at 44 - 45. Basically, in reading a pressure substantially above the threshold for more than 60 seconds, the system is confident that the occupant is an adult and it can safely lower the threshold to avoid changing the occupant classification due to a change in position. *See id.* at 45. The Child-Lock function works in the opposite manner, but for the same reason. With the Child-Lock function, the system raises the classification threshold after it senses a child who is sufficiently below the threshold for the requisite time period. *See id.* at 45 - 46. Presumably, by raising the threshold, the PODS-B system avoids

41

classifying a child as an adult because of a temporary increase in the child occupant's weight caused by the child's movement. Plaintiff has failed to show how the PODS-B product determines weight distribution, position, or center of gravity of the occupant, as those terms have been defined by the Court, by performing any of these three functions. Accordingly, the Court finds Plaintiff's arguments based on Ride-Learn, Adult-Lock, and Child-Lock functions to be without merit.

It is undisputed that the PODS-B product measures pressure and is capable of determining when that pressure has changed as a result of a change in occupant position. There is no evidence, however, tending to show that the PODS-B product uses these pressure readings to determine weight distribution, position of the occupant, or center of gravity of the occupant as the Court has defined these terms. Moreover, based on the evidence presented, it is more likely that it is impossible for the PODS-B system, which uses only one pressure sensor, to determine weight distribution, position, and center of gravity. *See* Breed Dep. at 40 ("If you ask someone skilled in the art how you would use a bladder sensor to determine the position of an occupant, I think that he would very quickly say that you would need multiple chambers and multiple transducers."). Accordingly, the Court finds that Defendant is entitled to summary judgment of noninfringement with respect to claims 7, 8, and 9.[5]

### 3.    Claims 10 and 11

Claims 10 and 11 include means-plus-function limitations. To find literal infringement of

---

[5] Plaintiff has not offered any substantive argument regarding the doctrine of equivalents. Assuming that Plaintiff has not abandoned any argument under the doctrine of equivalents, no reasonable jury could find that the PODS-B product "performs substantially the same function in substantially the same way to obtain the same result" as the invention claimed in the '504 patent. *Graver Tank & Mfg. Co. v. Line Air Prods. Co.,* 339 U.S. 605, 608 (1950) (citation omitted). Plaintiff has presented no evidence that the PODS-B product determines weight distribution, position, or center of gravity of the occupant.

42

a means-plus-function claim, "the patentee must establish that the accused device employs structure identical or equivalent to the structure disclosed in the patent and that the accused device performs the identical function specified in the claim." *WMS Gaming, Inc. v. International Game Technology*, 184 F.3d 1339, 1350 (Fed. Cir. 1999). Claim 10 recites the following:

> An occupant position sensor for a vehicle for determining the position of the occupant, comprising
>
>> a weight sensor for determining the weight of an occupant of a seat, said weight sensor comprising
>>
>>> a bladder having at least one chamber adapted to be arranged in a seat portion of the seat, and
>>>
>>> at least one transducer for measuring the pressure in a respective one of said at least one chamber; and
>>
>> processor means for receiving the determined weight of the occupant from said weight sensor and determining the position of the occupant based at least on [sic] part on the determined weight of the occupant.

'504 patent, at col. 32, lines 53-65. Claim 11 recites "[t]he occupant position sensor of claim 10, wherein said bladder comprises a plurality of chambers, each of said chambers being adapted to be arranged at a different location in the seat portion of the seat." *Id.* at col. 32, line 66 to col. 33, line 2. Defendant contends that the PODS-B product does not infringe claims 10 or 11 because (1) it senses only pressure, and does not "determine the weight" of the occupant, and (2) it does not utilize a processor means for "receiving the determined weight of the occupant" and "determining the position of the occupant" based on the determined weight of the occupant. Plaintiff responds by arguing that Defendant has repeatedly marketed its PODS-B product as a weight sensor capable of determining an occupant's weight.

43

The Court finds Defendant's argument persuasive. As the Court has found with respect to claims 7, 8, and 9, Plaintiff has presented no evidence tending to show that the PODS-B product determines the position of the occupant. It may react to changes in pressure cause by a change in the position of the occupant, but there is no evidence that it determines the point or area in space actually occupied by the occupant relative to the air bag door. Therefore, Plaintiff has failed to raise a genuine issue of material fact tending to show that the PODS-B device performs the identical function, or any substantial equivalent function, specified in claims 10 and 11. Accordingly, the Court finds that the PODS-B device does not infringe claims 10 or 11.

In summary, the Court finds that Plaintiff is entitled to summary judgment of infringement with respect to claims 1-2 and 5-6. Defendant, however, is entitled to summary judgment of noninfringement with respect to claims 4 and 7-11. Having resolved the parties arguments regarding infringement, the Court will now address Defendant's counterclaim challenging the validity of the '504 patent.

## C.    Validity

Patents are presumed to be valid under 35 U.S.C. § 282; thus, a defendant must show invalidity by facts supported by clear and convincing evidence. *See Dana Corp. v. Am. Axle & Mfg.*, 279 F.3d 1372, 1375 (Fed. Cir. 2002). With its counterclaim, Defendant asserts that claims 1-11 are invalid. Defendant argues that claims 1-11 are invalid under 35 U.S.C. § 102, which requires patents to claim novel inventions in order to be valid. In addition, Defendant argues that claims 8-11 are also invalid under 35 U.S.C. § 112, ¶ 1, which requires patents to adequately disclose the claimed invention in a manner sufficient for one skilled in the relevant art to make and use the invention. Plaintiff responds by arguing that claims 1-11 recite novel inventions and, furthermore, that claims

44

8-11 are sufficiently described in the '504 patent specification to enable one skilled in the art to make and use the invention.

### 1.    Anticipation Under 35 U.S.C. § 102

Patents are invalid if anticipated by prior art under 35 U.S.C. § 102. "A prior art reference anticipates a patent claim if the reference discloses, either expressly or inherently, all of the limitations of the claim." *EMI Group North America, Inc. v. Cypress Semiconductor Corp.*, 268 F.3d 1342, 1350 (Fed. Cir. 2001). Furthermore, "[a]nticipation . . . requires identity of invention: the claimed invention, as described in appropriately construed claims, must be the same as that of the reference in order to anticipate." *Glaverbel Societe Anonyme v. Northlake Marketing & Supply, Inc.*, 45 F.3d 1550, 1554 (Fed. Cir.1995). "Anticipation under 35 U.S.C. § 102 means lack of novelty, and is a question of fact." *Brown v. 3M*, 265 F.3d 1349, 1351 (Fed. Cir. 2001). Although anticipation is a question of fact, it may be decided on summary judgment if the record reveals no genuine issue of material fact. *See General Elec. Co. v. Nintendo Co. Ltd.*, 179 F.3d 1350, 1353 (Fed. Cir. 1999).

Section 102 provides as follows:

> A person shall be entitled to a patent unless -
>
> *        *        *
>
> (b) the invention was *patented* or *described in a printed publication* in this or a foreign country or in public use or on sale in this country, *more than one year prior to the date of the application for patent in the United States*, or
>
> *        *        *
>
> (e) the invention was described in . . . a patent granted on an application for patent by another filed in the United States before the

45

invention by the applicant for patent. . . .

35 U.S.C. § 102(b), (e). Under § 102(e), a patent is invalid if the invention is "described in a patent" that was granted on an application filed before the date of the invention. Under § 102(b), a patent is invalid if the claimed invention was "patented" or "described in a printed publication" in the United States or a foreign country more than one year before the date of application for the patent-in-suit. The one-year time period set forth in § 102(b) establishes a patent's "critical date." *See Scaltech v. Retec/Tetra,* 269 F.3d 1321, 1327 (Fed. Cir. 2001) ("The date exactly one year prior to the date of application for the patent is known as the critical date."). Only prior art existing before the critical date may be considered in determining invalidity under § 102(b).

Defendant argues that the following five references constitute prior art under § 102: (1) U.S. Patent No. 4,957,286 (the "'286 patent"); (2) Published European Patent Application No. 89110478.8 (the "'478 application"); (3) Published International Patent Application No. PCT/US98/00252 (the "'252 application"); (4) Defendant's own commercial offer to sell its PODS-B produce to Ford Motor Company; and (5) Defendant's own U.S. Patent No. 6,101,436 (the "'436 patent"). Defendant argues that the '286 patent and the '478 application render claims 1,4, and 5 invalid; the '252 application renders claims 2, 3, 6-8 and 10-11 invalid; and Defendant's commercial offer for sale and its '436 patent render claims 2 and 6-11 invalid if the Court finds that the PODS-B product infringes any of claims 2 and 6-11.

Plaintiff responds by arguing that other than the '286 patent and the '478 application, Defendant's alleged prior art references are not prior art because the '504 patent issued from a continuation-in-part application and is entitled to an effective filing date before the filing dates or

46

dates of publication of the alleged prior art. Plaintiff has not disputed the merits of Defendant's contention that the '252 application, its commercial offer to sell its product to Ford, and the '436 patent are sufficient to invalidate claims 2 and 6-11 if those references are considered prior art. As for the '286 patent and '478 application, Plaintiff argues that neither anticipates any of the '504 patent claims because both prior art references lack the necessary claim limitations found in the '504 patent.

The Court will first address the scope of the prior art. Thereafter, the Court will address whether any of the asserted claims are anticipated by that prior art under § 102.

### a. Scope of the Prior Art

As noted above, the primary dispute regarding the validity of claims 2 and 6-11 involves the "critical dates" of each claim. While the "critical date" for a patent is usually one year before the date the patent's application was actually filed in the United States Patent Office, if the patent issued from a continuation-in-part application, some of the claims may be entitled to the filing date of an earlier-filed "parent" application.[6] It is undisputed that the '504 patent is a continuation-in-part of U.S. Patent No. 6,078,854, (hereinafter "the '854 patent"), filed on August 4, 1998, which is a continuation-in-part of U.S. Patent No. 5,822,707, (hereinafter "the '707 patent"), filed on June 7, 1995, and a continuation-in-part of U.S. Patent No. 6,081,757, (hereinafter "the '757 patent"), filed on November 14, 1997. Naturally, Plaintiff argues that all of the '504 patent claims are entitled to the earliest filing date of the patent series, which is the June 7, 1995, filing date of the '707 patent.

---

[6] "A 'continuation-in-part' application is an application filed during the lifetime of an earlier application by the same applicant, which repeats either a substantial portion or all of the earlier application and also adds 'new matter' not disclosed in the earlier application." *Sarkisian v. Winn-Proof Corp.*, 697 F.2d 1313, 1323 n.23 (9th Cir. 1983) (citing U.S. Patent & Trademark Office, *Manual of Patent Examining Procedure*, § 201.08).

47

However, "[i]t is elementary patent law that a patent application is entitled to the benefit of the filing date of an earlier filed application only if the disclosure of the earlier application provides support for the claims of the later application . . . ." *In re Chu*, 66 F.3d 292, 297 (Fed. Cir. 1995) (citing *Mendenhall v. Cedarapids Inc.*, 5 F.3d 1557, 1566 (Fed. Cir. 1993)); *see also Studiengesellschaft Kohle v. Shell Oil Co.*, 112 F.3d 1561, 1564 (Fed. Cir. 1997) (noting that the earlier filing date "only applies to claims that recite subject matter adequately described in an earlier application, and does not extend to claims with subject matter outside the description in the earlier application."). Moreover, a continuation-in-part application receives the benefit of an earlier filing date only if the disclosure of the earlier application "'reasonably convey[s] to the artisan that the inventor had possession at that time of the later claimed subject matter.'" *Augustine Medical, Inc. v. Gaymar Indus., Inc.*, 181 F.3d 1291, 1302-1303 (Fed. Cir. 1999) (quoting *Waldemar Link v. Osteonics Corp.*, 32 F.3d 556, 558 (Fed. Cir. 1994)). Defendant maintains that claims 2, 3, and 6-11 of the '504 patent are not entitled to claim priority as of the June 7, 1995, filing date because the '707 patent does not adequately disclose the subject matter of those claims.

All three patents in the series generally describe, with some variation, a system for determining the weight or identity of an object in a seat using a fluid filled bladder, a transducer, and an ECU or other control means. Defendant argues that while a single-chambered bladder is disclosed in the '707 patent, a multi-chambered bladder is not. Thus, Defendant argues, claims 2, 6-9, and 11, which all require a plurality of chambers, are not entitled to a filing date earlier than the February 8, 2000, filing date of the '504 patent. Defendant further argues that concepts of determining weight distribution, body position, and center of gravity from the pressures measured in the chamber(s) of a bladder in a seat, as recited in claims 7-11, are similarly undisclosed in the

48

'707 patent.

Plaintiff, on the other hand, argues that the '707 patent discloses a plurality of chambers because Figure 5 of the '707 patent, which is the same as Figure 12 of the '504 patent, shows two distinct containers **515** and **518**. Plaintiff further argues that the presence of multiple chambers is implied in the '707 patent because the specification mentions multiple sensors and measurements. *See* '504 patent, at col. 7, lines 29-33 ("measure weight based on pressure measurements . . ."); *id.* at col. 3, lines 50-53 ("sensors located within the seat"). With respect to claims 7-11, Plaintiff maintains that the '707 patent describes a method of determining the position of the occupant. *See id.* at col. 2, lines 29-32. Plaintiff argues that because weight distribution and center of gravity may be determined based on the position of the occupant, the '707 patent adequately discloses determining weight distribution, center of gravity, and position of the occupant.

The Court finds Plaintiff's arguments unpersuasive. The '707 patent never refers to containers **515** and **518** as multiple chambers. Moreover, although the '504 patent refers to **518** as a chamber, it explicitly describes **515** as a bladder **518** as a "single chamber" within **515**.[7] '504 patent, at col. 29, lines 20-21. In addition, claims 2 and 6 of the '504 patent require that each of the chambers be positioned "at a different location in the seat portion of the seat." '504 patent, at claims 2 and 6. Figure 5 of the '707 patent discloses two "containers" - one round container, also described as a single chamber, inside another rectangular container. *See* '707 patent, at col. 9, lines 45-59. Since Figure 5 discloses one container inside another container, even if these two containers could be considered multiple chambers they are not placed in different locations within the seat

---

[7] Plaintiff recognized this fact in its claim construction brief. *See* Plaintiff's Claim Const. Brief, at 9 ("Figure 12 of the patent shows a bladder containing a single chamber with an orifice that allows the passage of fluid or air.")

portion of the seat. Thus, the Court finds meritless Plaintiff's argument that the two containers disclosed in Figure 5 adequately disclose a plurality of chambers.

Similarly unpersuasive is Plaintiff's contention that the '707 patent adequately discloses a plurality of chambers based on the presence of multiple pressure measurements or multiple sensors located within the seat. A discussion of why this argument fails can be found at footnote 5 of Plaintiff's own claim construction brief. In attacking Defendant's argument that any bladder that has multiple transducers must also have multiple enclosed chambers, Plaintiff argues the following:

> Delphi's construction syllogism appears to be that any bladder that has multiple transducers must also contain separate ('entirely enclosed') chambers. But that is not so, as recognized and disclosed in the '504 specification. Figure 1 shows a single, *undivided* bladder along with 'weight sensors 6 that determine the weight of the object occupying the seat.' Exh. A at col. 15, ll. 17-18. 'Sensor 6 may represent a plurality of different sensors which measure the weight applied onto the seat at different portions thereof or for redundancy purposes, e.g., such as by means of an airbag or bladder 5 in the seat portion 2. Airbag or bladder 5 may contain a single or a plurality of chambers . . .' Exh. A at col. 5, ll. 34-39.

Plaintiff's Claim Construction Brief, at 10 (emphasis added). Thus, Plaintiff's argument that multiple seat sensors disclosed in the '707 patent imply multiple chambers is undercut by its own claim construction argument where Plaintiff asserts that the presence of multiple sensors in the '504 patent does not imply multiple chambers within a single undivided bladder. Furthermore, the above-quoted paragraph also appears almost verbatim in the '707 patent at column 11, lines 3-17. Notably, however, the version of the paragraph included in the '707 patent does not refer to a plurality of chambers. Accordingly, the Court finds that claims 2, 6-9, and 11 of the '504 patent are not entitled to claim priority as of the '707 patent's earlier filing date because the '707 patent does not disclose the use of a weight sensor comprising of a "plurality of chambers."

50

The Court also finds that claims 7-9 are not entitled to the '707 patent's earlier filing date for additional reasons. As discussed above, claims 7-9 disclose a method of determining weight distribution, position of the occupant, and center of gravity of the occupant from the measured pressure in each of a plurality of chambers. Plaintiff argues that weight distribution and center of gravity of the occupant can be determined from the position of the occupant and that the concept of determining the position of the occupant is discussed in the '707 patent. The '707 patent's discussion of occupant position, however, is limited to determining the position with ultrasonic sensors located throughout the vehicle. Moreover, disclosure of methods for determining occupant position does not equal disclosure of methods for determining weight distribution. *See* Breed Dep. at 97 ("You could probably find multiple positions of the body that would result in the same weight distribution."). There is simply no discussion in the '707 patent regarding determining weight distribution from weight measurements of any type, nor is there any discussion regarding the ability to determine position of the occupant or center of gravity from weight distribution, all of which is required by claims 7, 8, and 9. Therefore, the Court finds that claims 7-9 are not disclosed in the '707 patent.

The Court, however, finds that claim 10 is adequately disclosed in the '707 patent. Claim 10 only requires that occupant position be determined based in part on weight, and the '707 patent specification refers to the use of a weight determination in conjunction with ultrasonic wave sensors to determine occupant position. *See* '707 patent, at col. 2, lines 24-33 (emphasis added) ("Once the morphological characteristics of a driver are determined by measuring his or her *height and weight*, other features can be incorporated into the system . . . . In addition, a determination of an out-of-position occupant can be made and based *thereon* . . . ."). Therefore, the Court finds that claim 10

51

is entitled to the earlier June 7, 1995, filing date of the application for the '707 patent. Since Defendant has not offered any prior art reference relevant to claim 10, the Court will not discuss validity under § 102 with respect to claim 10. Accordingly, the Court finds that claims 2, 6-9, and 11 of the '504 patent are not entitled to an effective filing date as of the filing date of the '707 patent; thus, the "critical date" for these claims is February 8, 1999.[8]

Having determined the "critical date" of the remaining asserted claims in this case, it is now possible to determine whether these claims are anticipated by the prior art offered by Defendant. As noted above, with respect to claims 2 and 6-11, Plaintiff has not challenged the merits of Defendant's anticipation arguments and has relied solely on its contention that those claims are entitled to the earlier filing date of the '707 patent. Nevertheless, the Court will briefly address Defendant's arguments regarding invalidity of claims 2 and 6-9, and 11 under § 102.

### b. Anticipation of Claims 2, 6-9, and 11[9]

Defendant argues that claims 2, 6-8, and 10-11 are anticipated by the '252 application. In addition, Defendant argues that claims 2 and 6-11 are anticipated by its commercial offer to sell its

---

[8] In pages 24-27 of Plaintiff's Response Brief, Plaintiff argues that even if the asserted claims are not entitled to the same filing date of the '707 patent, they are entitled to the filing date of either the '854 patent or the '757 patent. The Court, however, finds that the '854 and '757 fair no better in terms of adequately disclosing the subject matter of claims 2 and 6-9. Although these patents disclose perhaps more advanced inventions than that disclosed in the '707 patent, Plaintiff relies on essentially the same argument that multiple sensors in the seat imply multiple chambers. This argument fails with respect to the '854 and '757 patents just as it fails with respect to the '707 patent.

[9] Although Defendant argues that claim 3 is also invalid, claim 3 is not asserted by Plaintiff in this case. It would be error to invalidate claim 3 in the absence of any evidence that a case or controversy exists with respect to that claim. *See Jervis B. Webb Co. v. Southern Sys., Inc.*, 742 F.2d 1388, 1399 (Fed. Cir. 1984). Accordingly, the Court will not address Defendant's invalidity arguments with respect to claim 3.

52

product to Ford. Finally, if the PODS-B product is found to infringe claims 2 or 6, Defendant argues that claims 2 and 6 are also invalidated by Defendant's '436 patent, which Defendant alleges describes the PODS-B product accused of infringement. The Court will address each prior art reference and whether it anticipates any of the asserted claims.

### i. The '252 Application

The '252 application is an international patent application published on July 16, 1998, and constitutes prior art under § 102(b). *See In re Wyer*, 655 F.2d 221, 226-27 (CCPA 1981) (holding foreign patent applications that are made known to and are available to the public are "printed publications" under § 102(b)). It is undisputed that the '252 application discloses each and every limitation of claims 2, 6-8, and 11. Specifically, it is undisputed that the '252 application discloses a hydrostatic weight sensor system comprising of a fluid filled bladder having multiple chambers that are arranged in different locations of a seat. *See* Plaintiff's Response to Defendant's Statement of Material Facts not in Dispute, at ¶¶ 33-34. It is also undisputed that the '252 application teaches that weight, weight distribution, and position of the occupant can be obtained from the measured pressure in each of the plurality of chambers. *See id.* at ¶¶ 39 - 42. Finally, Plaintiff does not dispute that the '252 application discloses the use of a signal processor or electronic control module to calculate seat occupant position from the measured pressure in each of the chambers. *See id.* at ¶ 43. Therefore, the Court finds that claims 2, 6-8, and 11 are invalid as anticipated by the '252 application because it is undisputed that the '252 application discloses each and every limitation recited by those claims.

### ii. Defendant's Proposal to Ford

Defendant also argues that claims 2, and 6-11 are invalid as anticipated by Defendant's proposal to sell the PODS-B product to Ford (hereinafter "Proposal to Ford."). Section 102(b)

53

provides that a person is not entitled to a patent if the invention was "on sale in this country more than one year prior to the date of application for patent in the United States . . . ." 35 U.S.C. § 102(b). A two-prong test is used to determine whether the "on-sale" bar applies: "First, the product must be the subject of a commercial offer for sale . . . . Second, the invention must be ready for patenting." *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67-68 (1998). "A determination that a product was placed on sale prior to the critical date is a conclusion of law based on underlying findings of fact." *See Linear Tech. Corp. v. Micrel, Inc.*, 275 F.3d 1040, 1047 (Fed. Cir. 2001).

Defendant's Proposal to Ford is clearly a commercial offer for sale under the first prong of the *Pfaff* test. It is undisputed that the offer contains a description of the PODS-B product indicating that the product included: (1) a fluid-filled bladder embedded in a vehicle seat; and (2) a pressure sensor for measuring the pressure of the fluid in the bladder and outputting an electrical signal to an ECU. *See* Plaintiff's Response to Defendant's Statement of Material Facts Not in Dispute, at ¶ 47. It is also undisputed that the written proposal included drawings and schematic diagrams of Defendant's product, along with a delivery schedule that set forth tentative time periods for delivery of prototypes and production units of the PODS-B product to Ford's seat supplier. *See id.* at ¶¶ 48-49. Finally, it is undisputed that Defendant subsequently sent a formal quotation letter for the PODS-B product on February 23, 1998, which included, among other things, detailed pricing information for the PODS-B product, a bill of materials, and a statement that the quotation would " . . . remain valid until April 1, 1998." *See id.* at ¶ 50. Accordingly, given the undisputed facts, the Court finds that Defendant's Proposal to Ford constitutes a commercial offer to sell under § 102(b). *See Group One, Ltd. v. Hallmark Cards*, 254 F.3d 1041, 1048 (Fed. Cir. 2001) (holding that "[o]nly an offer which rises to the level of a commercial offer for sale, one which the other party could make

54

into a binding contract by simple acceptance (assuming consideration), constitutes an offer for sale under § 102(b).").

Defendant has also established that its PODS-B product was "ready for patenting" under second prong of the *Pfaff* test. An invention may be "ready for patenting" in one of two ways: (1) "by proof of reduction to practice before the critical date;" or (2) "by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Pfaff*, 525 U.S. at 68. According to Charles Gray, Defendant's Technical Manager for its occupant detection systems, by at least 1997, Defendant had developed operational prototypes of its PODS-B product that included a fluid-filled bladder with stabilizing spot welds and a pressure sensor for sensing the pressure of the fluid in the bladder. *See* Gray Decl. at ¶ 6; *see also* Exhibits in Support of Plaintiff's Reply Brief in Support of Infringement at, Ex. 22 (letter from General Motors describing a PODS-B system delivered in October 1997). Plaintiff has offered no evidence to rebut the sworn declaration of Mr. Gray. Accordingly, the Court finds that Defendant has offered sufficient evidence demonstrating that the PODS-B product was ready for patenting before the "critical date" of claims 2 and 6-11.

Having determined that the PODS-B product was the subject of a commercial offer for sale and ready for patenting, the remaining issue is whether the PODS-B product actually offered for sale anticipates claims 2 and 6-11. *See Ferag AG v. Quipp, Inc.*, 45 F.3d 1562, 1566 (Fed. Cir. 1995) (noting that an accused infringer asserting invalidity based on the on-sale bar "must demonstrate by clear and convincing evidence . . . that the subject matter of the sale or offer to sell fully anticipated the claimed invention."). If the Proposal to Ford does not fully anticipate the inventions disclosed in the asserted claims, the inventions were neither the subject of a commercial offer for sale nor were

55

they ready for patenting under § 102(b). The Court finds that only some of the asserted claims are anticipated by Defendant's Proposal to Ford.

The Court finds that claims 2 and 5-6 are anticipated by Defendant's Proposal to Ford. Implicit in Defendant's assertion of the "on-sale" bar is the idea that a product which literally infringes if later in time anticipates if earlier in time. *See Lewmar Marine, Inc. v. Barient, Inc.*, 827 F.2d 744, 748 (Fed. Cir. 1987) ("That which would literally infringe if later in time anticipates if earlier than the date of invention.") (emphasis omitted). In other words, because the Court has found that the PODS-B product literally infringes claims 1-2 and 5-6, Defendant's Proposal to Ford necessarily anticipates those claims because the finding of literal infringement required a determination that the PODS-B product embodies every limitation found in those claims. Accordingly, because Defendant sent its Proposal to Ford well before the critical date of claims 1-2 and 5-6, the Proposal to Ford anticipates those claims. Claims 4 and 7-11, however, are not anticipated by the Proposal to Ford because the PODS-B product does not embody each and every limitation of those claims. *See* **Part IV.B.2-3**, *supra*.

### iii.    Defendant's '436 patent

Under § 102(e), a patent claim is invalid if "the invention was described in . . . a patent granted on an application for patent by another filed in the United States before the invention by the application for patent . . . ." 35 U.S.C. § 102(e). Defendant argues that claims 2 and 6 are also anticipated by Defendant's '436 patent. According to Defendant, the '436 patent describes and claims the commercially available PODS-B product accused of infringement.

Defendant's '436 patent application was filed on February 18, 1998. It is undisputed that the '436 patent discloses a weight estimation device using a fluid-filled bladder having spot welds in

56

approximately circular patterns, like that of Defendant's commercially available PODS-B product. *See* Plaintiff's Response to Defendant's Statement of Material Facts not in Dispute, at ¶¶ 58-59. It is also undisputed that the '436 patent discloses the use of a pressure sensor to measure the pressure of the fluid in the bladder and provide an output signal to a controller for comparison with a threshold value to determine whether the airbag should be deployed. *See id.* at ¶¶ 60-61. The Court has already determined that these same features are sufficient to support a finding that the PODS-B product literally infringes claims 1-2 and 5-6. *See* **Part IV.B.1.** *supra*. Accordingly, because the '436 patent discloses these same features and was filed before the critical date of the '504 patent, the '436 patent anticipates claims 1-2 and 5-6.

### c.     Anticipation of Claims 1, 4, and 5

Defendant further argues that the '286 patent and the '478 application each disclose all of the claim limitations found in claims 1, 4, and 5. The '286 patent is a U.S. patent issued on September 18, 1990. The patent is directed to a weight sensor embedded in the seat of an exercise bicycle for measuring and displaying the weight of the seat occupant. *See* '286 patent, at col 1, lines 9-16. The weight measuring device comprises a "compressible, gas-holding container elastomeric mounted within said seat, said seat comprising a seat cover enclosing seat cushioning material which encapsulates said container said container connected to a meter responsive to changes in the pressure of said gas . . ." *Id.* at col. 4, lines 60-65. Although the '278 patent describes the use of a pressure gauge to provide a visual indication of the seat occupant's weight as a preferred mode for indicating weight, it also states that other mechanisms may be used, such as a "transducer device acted upon by gas pressure, and in turn activating an LED read-out, or meter appropriately calibrated to convert electrical signals into an indication of weight." *Id.* at col. 4, lines 8-11. Therefore, the '278 patent

describes an air or gas filled bladder inside a seat to be used in conjunction with a gauge or a transducer for measuring the weight of an individual sitting on the seat.

Defendant argues that the '278 patent discloses each and every limitation found in claims 1, 4, and 5. As noted above, claim 1 recites a weight sensor comprising (1) "a bladder having at least one chamber adapted to be arranged in a seat portion of the seat," and (2) "at least one transducer for measuring the pressure in a respective one of said at least one chamber." '504 patent, at col. 32, lines 11-14. Claim 4 is the same, but it limits the invention to a bladder consisting of a single chamber only. *See id.* at col. 4, lines 25-26. Claim 5 recites a method for determining the weight of an occupant of a seat comprising the steps of (1) "arranging a bladder having at least one chamber in a seat portion of the seat," and (2) "measuring the pressure in each of the at least one chamber whereby the weight of the occupant is obtainable from the measured pressure in each of the at least one chamber." *Id.* at col. 4, lines 28-35. Defendant argues that the '278 patent discloses all of these limitations; namely, a bladder arranged in the seat portion of the seat, a transducer for measuring the pressure in the bladder and converting that measurement into an electrical signal.

Plaintiff's only argument in response is that the '278 patent discloses the use of a bicycle seat, not an automobile seat with a seat portion and a back portion. Plaintiff argues that because the term "seat" in claims 1, 4, and 5 should be construed to mean an automobile seat with a back portion, the '278 patent does not disclose each and every claim limitation. The Court, however, rejected Plaintiff's proposed construction of "seat" in **Part IV.A.5** *supra.* The Court construed "seat" to mean "something intended to be sat in or on." *See* **Part IV.A.5** *supra.* Clearly, the bicycle seat described in the '278 patent falls within this definition. Accordingly, no reasonable jury could find that the '278 patent does not disclose each and every element of claims 1, 4, and 5 of the '504

58

patent.[10]

To summarize, the Court finds that claims 2, 6-8, and 11 are invalid as anticipated by the '252 application. In addition, the Court also finds that claims 1-2 and 5-6 are invalid as anticipated by Defendant's Proposal to Ford and by Defendant's '436 patent. Finally, the Court finds that claims 1, 4, and 5 are invalid as anticipated by the '286 patent. Therefore, the only remaining asserted claims are claims 9 and 10. Defendant, however, maintains that claims 8-11 are also invalid for nonenablement under 35 U.S.C. § 112, ¶ 1.

### 2.    Lack of Enablement Under 35 U.S.C. § 112, ¶ 1.

Defendant argues that claims 8-11 are invalid under 35 U.S.C. § 112, ¶ 1, because the '504 patent does not enable one skilled in the art to practice the invention recited in those claims without undue experimentation. As discussed above, claims 8 and 9 require the determination of the "position of the occupant" and "the center of gravity of the occupant" respectively, based on the determined weight distribution. In addition, claims 10 and 11 each require a "processor means for . . . determining the position of the occupant based at least on [sic] part on the determined weight of the occupant." Defendant claims that the '504 patent fails to describe how any of these determinations are made. Plaintiff argues that the '504 patent sufficiently discloses how to practice the claimed invention to a person skilled in the art.

Section 112, ¶ 1, provides as follows:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same . . . .

_____

[10] Since the Court finds claims 1, 4, and 5 anticipated by the '278 patent, it is unnecessary to determine whether those claims are also anticipated by the '478 application.

59

35 U.S.C. § 112, ¶ 1. Claims that are not enabled by the specification are invalid. *See e.g., AK Steel Corp., v. Sollac & Ugine,* 344 F.3d 1234, 1245 (Fed. Cir. 2003). "The enablement requirement ensures that the public knowledge is enriched by the patent specification to a degree at least commensurate with the scope of the claims." *National Recovery Tech., Inc. v. Magnetic Separation Sys., Inc.,* 166 F.3d 1190, 1195 (Fed. Cir. 1999). In other words, "[t]he scope of the claims must be less than or equal to the scope of the enablement." *National Recovery Tech., Inc.,* 166 F.3d at 1196. The "scope of the enablement" is "that which is disclosed in the specification plus the scope of what would be known to one of ordinary skill in the art without undue experimentation." *Id.* (citation omitted). Thus, the patentee need not spell out details of the invention that would be known to a person with ordinary skill in the art. Finally, the party asserting invalidity based on lack of enablement must prove the defense by clear and convincing evidence. *See id.* The Court will address the parties arguments regarding enablement with respect to each claim.

### a.    Claim 8

Defendant argues that the '504 patent does not adequately disclose how to determine position of the occupant from weight distribution, as required by claim 8. The Court, however, rejects this argument. It is undisputed that the '252 application discloses how to determine position of the occupant based on weight distribution calculated from the pressure exerted on a plurality of chambers in a fluid-filled bladder. *See* Plaintiff's Response to Defendant's Statement of Material Facts not in Dispute, at ¶ 41. Accordingly, because the '252 application was filed well in advance of the '504 patent, the Court finds that a person with ordinary skill in the art would know how to determine position of the occupant from weight distribution. *See In re GPAC, Inc.,* 57 F.3d 1573, 1579 (Fed. Cir. 1995) ("The person of ordinary skill in the art is a hypothetical person who is

60

presumed to know the relevant prior art."). Therefore, claim 8 is not invalid for lack of enablement.

**b.     Claim 9**

Defendant also argues that the '504 patent does not adequately disclose how to determine an occupant's center of gravity from the occupant's measured weight distribution, as required by claim 9. Defendant points to the fact that none of Plaintiff's experts have offered an opinion as to how an occupant's center of gravity may be determined from the occupant's weight distribution. Plaintiff argues that William DuVall, one of the listed inventors on the '504 patent, developed algorithms that were able to take the outputs of strain gauge weight sensors and calculate center of gravity. *See* DuVall Dep. at 44. Plaintiff admits, however, that Mr. DuVall's calculations were based only on two dimensions, not three dimensions. As the Court found in **Part IV.A.4**, *supra*, center of gravity is a three dimensional concept, which means "the point at which the entire weight of a body may be concentrated so that if supported at this point the body would remain in equilibrium in any position." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 221 (1991). Plaintiff has not offered any evidence tending to show that a person skilled in the art would know how to determine an occupant's center of gravity in three dimensions from the occupant's weight distribution. Furthermore, the '504 patent fails to include any discussion of how to determine center of gravity from weight distribution. The only portion of the patent relied upon by Plaintiff is column 29, lines 20-30, which merely suggests in conclusory fashion that it is possible to determine center of gravity from weight distribution. *See* '504 patent, col. 29; lines 20-30 (emphasis added) ("The use of multiple chambers permits the weight distribution of the occupant to be determined if a separate pressure transducer is used in each cell of the bladder. *Such a scheme gives the opportunity of determining to some extent the position of the occupant on the seat or at least the position of the center of gravity of the*

61

*occupant.*"). Therefore, given the absence of discussion in the '504 patent regarding determining center of gravity from weight distribution and the lack of evidence tending to show that one skilled in the art would know how to derive center of gravity from weight distribution, the Court finds that claim 9 is invalid for nonenablement.

### c.    Claims 10 and 11

Claim 10 describes an "occupant position sensor" comprising of a weight sensor using a bladder with at least one chamber and at least one transducer, and a processor means for receiving the determined weight from the weight sensor and determining the position of the occupant based at least in part on the determined weight of the occupant. *See* '504 patent, at col. 32, lines 54-65. Claim 11 depends from claim 10 and adds the requirement that the bladder consist of a plurality of chambers. *See id.* at col. 32, lines 67-68, and col. 33, lines 1-2. Defendant argues that the '504 patent specification fails to adequately disclose how the position of the occupant may be determined based on occupant weight. Plaintiff argues that the specification adequately discloses how to determine position of the occupant based in part on weight, as explicitly required by claims 10 and 11, and also based in part on the readings taken by various other wave sensors within the vehicle. Defendant, however, responds by arguing that although the '504 patent discloses a "seated state detecting unit" that uses both wave sensors and a weight sensor, the wave sensors determine occupant position while the weight sensor determines only occupant classification, *i.e.*, whether the occupant is a child or adult.

The Court finds Plaintiff's argument persuasive. Claim 10 requires only that the position of the occupant be determined "at least [in] part on the determined weight of the occupant." *See id.* at col. 21, lines 63-64. As Plaintiff points out, the specification repeatedly discusses the use of wave

62

sensors in combination with a weight sensor in order to determine the "seated state." *See id.* at col. 8, lines 13-26, and 50-51; col. 7, lines 41-50; col. 3, lines 60-67 - col. 4, lines 1-13. Determining the "seated state" includes a determination of occupant position; specifically. *See, e.g., id.* at col. 14, lines 5-8 (describing figure 4(b) as "showing an example of the reflected waives obtained when a passenger is in an abnormal seated-state (where the passenger is seated too close to the instrument panel) . . . ."). In addition, the '504 patent never explicitly reserves the function of determining the position of the occupant to the wave sensors alone, as Defendant argues. Instead, the patent details the disadvantages of using only wave sensors to determine the seated state:

> However, in the aforementioned literature using ultrasonics, the pattern of reflected ultrasonic waves from an adult occupant who may be out of position is sometimes similar to the pattern of reflected waves from a rear facing child seat. Also, it is sometimes difficult to discriminate the wave pattern of a normally seated child with the seat in a rear facing position from an empty seat with the seat in a more forward position. In other cases, the reflected wave pattern from a thin slouching adult with raised knees can be similar to that from a rear facing child seat. In still other cases, the reflected pattern from a passenger seat which is in a forward position can be similar to the reflected wave pattern from a seat containing a forward facing child seat or a child sitting on the passenger seat. In each of these cases, the prior art ultrasonic systems can suppress the deployment of an airbag when deployment is desired or, alternately, can enable deployment when deployment is not desired.

> If the discrimination between these cases can be improved, then the reliability of the seated-state detecting unit can be improved and more people saved from death or serious injury. In addition, the unnecessary deployment of an airbag can be prevented.

'504 patent, at col. 2, lines 32-47. Thus, by classifying the occupant as a child or an adult based on weight, the weight sensor also aids in the determination of occupant position. A fair reading of the written description reveals that if the weight sensor determines that an adult is sitting in the seat, the

63

scated state detecting unit uses this information to determine, for example, that the occupant is a slouching adult with raised knees instead of a child facing rearward in a child seat. Accordingly, the Court finds that Defendant has not established by clear and convincing evidence that one skilled in the art would be unable to practice the inventions set forth in claims 10 and 11 without undue experimentation. Therefore, Defendant is not entitled to summary judgment of nonenablement with respect to claims 10 and 11.

## D.   Conclusion

Accordingly, the Court finds that Plaintiff is entitled to summary judgement of infringement with respect to claims 1-2 and 5-6. The Court also finds, however, that Defendant is entitled to summary judgment of non-infringement with respect to claims 4 and 7-11. Since the Court finds that claims 1-2 and 5-6 are invalid as anticipated by prior art, Defendant is entitled to summary judgment with respect to all of the asserted claims and Plaintiff's Complaint will be dismissed.

## V. CONCLUSION

Therefore, for the reasons set forth above, Plaintiff's Motion for Summary Judgment of Infringement is hereby GRANTED IN PART: Plaintiff is entitled to summary judgment of infringement with respect to claims 1-2 and 5-6 only; (2) Defendant's Motion for Partial Summary Judgment of Noninfringement of Claims 2 and 6-11 of U.S. Patent No. 6,442,504 is hereby GRANTED IN PART: Defendant is entitled to summary judgment of noninfringement with respect to claims 4 and 7-11 only; (3) Defendant's Motion for Summary Judgment of Invalidity of Claims 1-11 of U.S. Patent No. 6,442,504 Under 35 U.S.C. § 102 is hereby GRANTED IN PART: Defendant is entitled to summary judgment of invalidity under 35 U.S.C. § 102 with respect to

64

claims 1-2, 4-8, and 11 only; and (4) Defendant's Motion for Partial Summary Judgment of Invalidity of Claims 8-11 of U.S. Patent No. 6,442,504 Under 35 U.S.C. § 112, ¶ 1 is hereby GRANTED IN PART; Defendant is entitled to summary judgment of invalidity under 35 U.S.C. § 112, ¶ 1, with respect to claim 9 only. Thus, asserted claims 3 and 10 are not invalid.

IT IS SO ORDERED.

Dated: **SEP 2 9 2004**

LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

PURSUANT TO RULE 77(d), FRCIVP
COPIES HAVE BEEN MAILED TO:
Andrew Kochanowski
Michael Banias
R. Terrance Rader
William Conouchi
ON 9-29-04
Maria Verlinde
DEPUTY COURT CLERK